**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| VALDA MURFREE-FLEMING | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1180 (HHK) |
| | ) | |
| JAMES H. BILLINGTON, | ) | |
| In his official capacity as | ) | |
| Librarian of Congress, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, defendant James H. Billington, in his official capacity as the Librarian of Congress, hereby moves this Court for an order granting summary judgment in his favor. The record in this case shows that no genuine issue as to any material fact exists as to the claims being made by plaintiff, and defendant is entitled to judgment as a matter of law.

In support of this motion, defendant respectfully refers the Court to the accompanying memorandum of points and authorities and to the accompanying statement of material facts as to which there is no genuine issue. A draft order reflecting the requested relief is also attached.

October 12, 2006                    Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 489610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-1249
(202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| VALDA MURFREE-FLEMING | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1180 (HHK) |
| | ) | |
| JAMES H. BILLINGTON, | ) | |
| In his official capacity as | ) | |
| Librarian of Congress, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**</u>

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), defendant submits this statement of material facts as to which she contends there is no genuine dispute:

1. Plaintiff first began her employment with the Library of Congress in 1991 as a supervisor of the correspondence unit for the Copyright Office. Deposition of Valda Murfree-Fleming 12:7-12:9 ("Pltf's Depo") (Exhibit 1).

2. On October 16, 1994, plaintiff transferred from the Copyright Office to become a GS-7 Professional Development Associate/Affirmative Action Associate with the Office of Affirmative Action/Special Programs. Pltf's Depo. 12:21-12:24; Exhibit 2 (October 16, 1994 SF-50).

3. On October 15, 1995, plaintiff transferred from the Professional Development Associate position to become a GS-1102-9 Procurement Specialist in the Library's Contracts & Logistics Office ("C&L"). Pltf's Depo. 18:1-18:13; Exhibit 3 (October 15, 1995 SF-50). Plaintiff's position as a Procurement Specialist was a career ladder position that began at the GS-

7 level and progressed to the GS-11 level.[1]  Pltf's Depo. 18:19-20:1.  On November 10, 1996, plaintiff received her career ladder promotion to the GS-1102-11 level.  Pltf's Depo. 20:8-20:11; Exhibit 6 (November 10, 1996 SF-50).  Accordingly, as of November 10, 1996, plaintiff had reached the maximum grade level she could without having to apply for and compete for a promotion.  Exhibits 5 & 6.

4.  At the time plaintiff joined C&L, the section was divided into two sections, one handled "large purchases," which were purchases over $50,000, and the other "small purchases," which were purchases under $50,000.  Pltf's Depo. 72:8-72:17.  Plaintiff was on the team that handled small purchases.  Pltf's Depo. 72:18-72:21.

5.  In approximately August 1998, C&L was realigned and the large and small purchases sections were integrated, although there were still two teams.  Pltf's Depo. 74:5-74:13.  Under this realignment, plaintiff began working on contracts that were over $100,000.  Pltf's Depo. 74:21-75:2.  In approximately 2000, Ms. Kaye Klinker became the team leader of the team on which plaintiff was working.  Pltf's Depo. 75:16-75:23.

6.  Plaintiff was not happy on Ms. Klinker's team and requested to be, and was, transferred to the other team, which was led by Mr. Napolean Jasper.  Pltf's Depo. 76:18-76:22; 77:10-77:12.

7.  In early 2001, C&L requested that Martin Contract Management, Inc. ("MCM") perform an efficiency study of C&L.  Pltf's Depo. 82:4-82:8; Testimony of Catherine Martin

---

[1]  In 1998, plaintiff's title was changed to Contract Specialist, although her duties and responsibilities remained the same as previously, and her position remained a career ladder GS-7 through GS-11 position.  Pltf's Depo. 30:9-32:6; Exhibit 4 (July 19, 1998 SF-50);  Exhibit 5 (GS-1102-11 Contract Specialist Position Description).

221:8-221:17 ("Martin Testimony") (attached as Exhibit 7).  In the fall of 2001, MCM

completed its study and made its recommendations to C&L management.  Pltf's Depo. 82:9-

82:12; Martin Testimony 221:18-222:3.  One of MCM's findings was that approximately 70% of

the work in C&L involved contracts under $100,000, and 30% of the work involved contracts

over $100,000.  Pltf's Depo. 82:13-82:22; Martin Testimony 222:4-224:19.  MCM also

recommended that, based on the workload, C&L be divided into two sections, one to handle

purchases over $100,000 and one to handle purchases under $100,000.  Pltf's Depo. 83:22-84:1;

Martin Testimony 221:18-222:20.

       8.  C&L management decided to implement the MCM findings and, to do so, hired Ms.

Catherine Martin, who was a principle of MCM, as the Acting Chief of C&L and to implement

the study's findings.  Pltf's Depo. 84:6-85:14; Martin Testimony 222:21-223:8.

       9.  Consistent with the MCM study and recommendations, one of Ms. Martin's first

actions was to assign one of the two teams to handle purchases over $100,000 and assign the

other team to handle purchases under $100,000.  Pltf's Depo. 86:12-86:16; Martin Testimony

223:9-223:1.  Additionally, consistent with the structure of the office prior to the implementation

of the MCM findings, Team One was led by Mr. Jasper and Team Two was led by Ms. Klinker .

Pltf's Depo. 86:17-87:5.  Team One handled contracts under $100,000 and Team Two handled

contracts over $100,000.  Pltf's Depo. 87:6-87:13; Martin Testimony 223:13-225:2.  The ***only***

exception to the division of work by dollar value between the two teams was that plaintiff was

permitted to continue working on the one contract she was working on previously that was

valued at over $100,000.  Pltf's Depo. 98:4-99:1.

10.  Ms. Helen Mathura and Ms. Ruth Nelson, the two senior grade level contract

specialists in C&L were assigned to Team Two, the team led by Ms. Klinker.  Pltf's Depo.

96:16-96:23; Martin Testimony 224:20-225:2, 240:7-240:11 ("We took into effect the

experience level and the capabilities of the people, the experience level."), 244:2-244:5.  The

other contract specialists in the office,  including plaintiff, all of whom were junior in grade level

to those contract specialists on Team Two, were assigned to Team One, the team led by Mr.

Jasper.  Pltf's Depo. 97:25-98:3; Martin Testimony 224:2-224:19, 243:18-243:21.

11.  A little less than a year after being hired as the Acting Chief of C&L and realigning

C&L, Ms. Martin left her position with the Library of Congress.  Pltf's Depo. 106:4-106:10;

Martin Testimony 225:9-225:19.  Shortly after Ms. Martin left, Mr. Jasper took over the office.

Pltf's Depo. 107:15-107:20; Compl. ¶ 23 ("Mr. Jasper was placed in charge of both teams which

were subsequently combined into one team").

12.  In approximately November 2002, C&L was again realigned.  Under this

realignment, all individuals had the opportunity to work on all contracts, regardless of dollar

value.  Compl. ¶ 22; Pltf's Depo. 109:18-109:22.

13.  During the almost one year that C&L was realigned into two teams, plaintiff retained

her GS-11 grade level, maintained her Contract Specialist position, continued to make the same

salary, continued to receive cost of living raises, continued to accrue benefits at the same level,

continued to work on contracts, and maintained the same supervisor; during the almost one year

realignment, "[e]verything remained at the same level."  Pltf's Depo. 99:5-100:22.  Moreover,

plaintiff continued to perform the duties specified in her position description.  Pltf's Depo.

54:17-60:19 (affirming that she performed the duties described in the GS-1102-11 Contract

4

Specialist Position Description); Exhibit 8 (GS-1102-11 Contract Specialist Position Description effective May 2001).

14.    Although plaintiff's complaint alleges that the realignment of C&L "caused her to remain at the GS-11 level for approximately five years despite receiving excellent and outstanding evaluations," see Compl. ¶ 21, plaintiff acknowledges that there are no instances or allegations of her being non-selected for a promotion on the basis of her race or age at issue in this action. Pltf's Depo. 121:15-122:6. Moreover, in deposition, plaintiff could identify no specific promotion for which the realignment hampered her ability to obtain. Pltf's Depo. 129:11-130:16.

15.    On July 3, 2002, plaintiff filed a timely formal complaint of discrimination regarding the realignment of C&L. Exhibit 9 (July 3, 2002 Formal Complaint of Discrimination). This formal complaint alleged that the realignment was discriminatory against plaintiff solely on the basis of her race.[2] Pltf's Depo. 125:11-127:11; Exhibit 9.

16.    Plaintiff's complaint requests that she be reimbursed for her master's degree tuition because she obtained permission from the Library to study the Procurement Office as part of the course work for a master's degree. Compl. ¶¶ 24-25. Notwithstanding this request, plaintiff has never requested that she receive reimbursement of her student loans under the Library's student loan repayment program. Pltf's Depo. 137:4-137:12, 146:4-146:8. Moreover, plaintiff has never filed an EEO complaint relating to the Library's failure to pay her master's degree tuition, other

---

[2]  Although in deposition plaintiff stated that she believed that she amended one of her complaints of discrimination, she could not recall whether it was the one involved in this action and did not subsequently produce an amended complaint in discovery. See Pltf's Depo. 127:12-128:14.

than requests for relief filed in the course of litigating her discrimination claim.  Pltf's Depo. 146:13-146:15; 151:21-151:25.

October 12, 2006                          Respectfully submitted,


                                          _____/s/_____
                                          JEFFREY A. TAYLOR, D.C. Bar # 489610
                                          United States Attorney


                                          _____/s/_____
                                          RUDOLPH CONTRERAS, DC BAR #434122
                                          Assistant United States Attorney


                                          _____/s/_____
                                          JOHN F. HENAULT, D.C. Bar # 472590
                                          Assistant United States Attorney
                                          555 4th Street, N.W.
                                          Washington, DC 20530
                                          (202) 307-1249
                                          (202) 514-8780 (facsimile)


                                          7

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VALDA MURFREE-FLEMING | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1180 (HHK) |
| | ) | |
| JAMES H. BILLINGTON, | ) | |
| In his official capacity as | ) | |
| Librarian of Congress, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

Defendant James H. Billington, in his official capacity as the Librarian of Congress, respectfully submits this memorandum in support of his motion for summary judgment.

## STATEMENT OF THE CASE

Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., alleging discrimination on the basis of her race and gender. Specifically, plaintiff alleges that in November, 2001, the Contract and Logistics Section ("C&L") of the Library of Congress was realigned and she was assigned to the "small purchases" section on the basis of her race and gender.

As explained in detail below, plaintiff's claims fail as a matter of law because she cannot show a prima facie case of race discrimination. Moreover, plaintiff failed to exhaust any claims of gender discrimination. And, even if plaintiff can establish a prima facie case of race or gender discrimination, defendant had a legitimate non-discriminatory reason for the reorganization of C&L and plaintiff's assignment to the "small purchases" section.

First, because plaintiff herself acknowledges that she was performing the duties of her position, and the reorganization did not effect the terms or conditions of her employment, she has not suffered an adverse employment action. Second, plaintiff's complaint itself acknowledges that prior to the filing of this action, C&L was reorganized again in 2002, a year after the initial reorganization, and that this second reorganization was "to a more equitable format whereby every individual whether African-American or Caucasian, male of female, was given equal opportunity to excel." Compl. at ¶ 22. Thus, under Taylor v. Small, 350 F.3d 1286, 1293-93 (D.C. Cir. 2003), defendant cured the action at issue before it was the subject of litigation, and plaintiff has not suffered an adverse employment action. Finally, to the extent that the Court finds that plaintiff can establish a prima facie case of discrimination, defendant had a legitimate, non-discriminatory reason for the reorganization at issue and plaintiff's assignment to the small purchases section – a study conducted by an outside agency showed that C&L could operate more efficiently if it were divided into a small purchases and large purchases section, and plaintiff acknowledges that the senior employees of C&L were assigned to the large purchases section.

## FACTS

Defendant hereby incorporates his Statement of Material Facts Not In Dispute ("Stmt. of Facts.").

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Tao v. Freeh, 27 F.3d 635,

638 (D.C. Cir. 1994).  Under the summary judgment standard, defendant, as the moving party,

bears the "initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which it believes demonstrate the absence of a

genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Plaintiff, in

response to defendant's motion, must "go beyond the pleadings and by [their] own affidavits, or

depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing

that there is a genuine issue for trial." Id. at 324 (internal citations omitted).

        Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To be

material, the factual assertion must be capable of affecting the substantive outcome of the

litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a

reasonable trier-of-fact could find for the nonmoving party.  Laningham v. U.S. Navy, 813 F.2d

1236, 1242-43 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251 (the court must determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is

merely colorable, or is not sufficiently probative, summary judgment may be granted." Liberty

Lobby, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials in the

adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary

judgment." Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must

do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Id. at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting Calhoun v. Johnson, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), aff'd, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); see also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." Marshall, 276 F. Supp. 2d at 47 (quoting Celotex Corp., 477 U.S. at 327).

## II.    STANDARD FOR EVALUATING DISCRIMINATION CLAIMS

The procedure for resolving a claim of discrimination such as the instant claim is well-established. In the absence of direct evidence of discrimination, a plaintiff may rely on inferential evidence under McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). The plaintiff must first, by a preponderance of the evidence, establish a prima facie case of

4

discrimination.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  To establish a prima facie case of discrimination in a Title VII case, plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse personnel action; (3) under circumstances giving rise to an inference of discrimination.  See Stella v. Mineta, 284 F.3d 135, 144-45 (D.C. Cir. 2002) (citing Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir.1999)).

    If the employee succeeds in establishing a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action.[1]  See McDonnell Douglas, 411 U.S. at 802, 804.  Even if the Court suspects that a job applicant "was victimized by [ ] poor selection procedures" it may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982).  Thus, "[o]nce the employer has articulated a non-discriminatory explanation for its action, the issue is not 'the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.'" Fischbach v. District of Columbia Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citing McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir.1992); Pignato v. American Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason.")).

_____

    [1]  Defendant's burden is a "relatively light burden," Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994), and it "need not persuade the Court that it was actually motivated by the proffered reasons." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  See also St. Mary's, 509 U.S. at 509 ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").

Once both parties meet their respective burdens of production, the burden shifting scheme becomes irrelevant. <u>Hicks</u>, 509 U.S. at 510. Then, the plaintiff must establish that the employer's "proffered reason was not the true reason for the employment decision," and that the plaintiff's membership in a protected class was the true reason for the employment action. <u>Id.</u> at 508; <u>Aka v. Washington Hosp. Center</u>, 156 F.3d 1284, 1292-93 (D.C. Cir. 1998) (en banc); <u>Mungin v. Katten Muchin & Zavis</u>, 116 F.3d 1549, 1554 (D.C. Cir. 1997). <u>See</u> also <u>St. Mary's</u>, 509 U.S. at 515-516 ("But a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (Emphasis in original))

A plaintiff must present *substantial* and *credible* evidence of discrimination to survive a motion for summary judgment. <u>See</u> <u>Greene v. Dalton</u>, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); <u>Carpenter v. Federal Nat'l Mortgage Ass'n</u>, 165 F.3d 69, 72 (D.C. Cir. 1999) (if plaintiff merely shows that the legitimate nondiscriminatory reason offered by the employer is a pretext for a decision intending to cover up an unsavory reason -- but one that is not illegal under the antidiscrimination law, the plaintiff is not entitled to try issues of fact, and summary judgment for the employer is appropriate.); <u>Hastie v. Henderson</u>, 121 F. Supp. 2d, 72, 77 (D.D.C. 2000) <u>aff'd</u>, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001) ("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"); <u>Woodruff v. DiMario</u>, 164 F. Supp. 2d 1, 5 (D.D.C. 2001).

Additionally, there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Weigert v. Georgetown University, 120 F. Supp. 2d 1, 22 (D.D.C. 2000) (quoting Reeves v. Sanderson Plumbing Co., 530 U.S. 133 (2000)).

## III.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CLAIM OF DISCRIMINATION

### A.    The Reorganization Did Not Effect The Terms Or Conditions Of Plaintiff's Employment

Not "all personnel decisions with negative consequences for the employee" qualify as legally cognizable adverse actions. Ware v. Billington, 344 F. Supp. 2d 63, 71 (D.D.C. 2004) (citing Forkkio, 306 F.3d at 1130-31). Absent a reduction in pay or benefits, only those actions creating "materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities" amount to adverse actions. Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999). A "tangible change in the duties or working conditions constituting a material employment disadvantage," or a significant change in employment status, such as hiring, firing, failing to promote, or a reassignment with significantly different responsibilities is necessary. Mack v. Strauss, 134 F. Supp. 2d 103, 111 (D.D.C. 2001) (citations omitted). Stated differently, "[n]ot everything that makes an employee unhappy is a judicially actionable adverse action." Burton v. Batista, 339 F. Supp. 2d 97, 110 (D.D.C. 2004) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). Instead, an employee must suffer "objectively tangible harm." Brown, 199 F.3d at 457. Therefore, purely subjective

7

injuries, such as dissatisfaction with a reassignment or public humiliation or loss of reputation, do not constitute adverse actions. <u>Forkkio</u>, 306 F.3d at 1130 (citations omitted).

Plaintiff alleges that the realignment of C&L in November 2001 was discrimination against her on the basis of her race and gender. She asserts that the realignment was discrimination because it "caused Plaintiff to remain at the GS 11 level for approximately five years despite receiving excellent and outstanding evaluations." Compl. ¶ 21. At the time of the realignment, plaintiff was a GS-11, which is the top grade for her career ladder position. Stmt. of Mat. Facts ¶ 3. Thus, to get a promotion, plaintiff had to apply for and compete for a promotion to a different grade level position. It is important to note, however, that there are no non-selections at issue in this action, and plaintiff has not identified any promotions that she sought and did not receive as a result of the realignment. Stmt. of Mat. Facts ¶ 14. Thus, plaintiff's conclusory, speculative and unsupported statement that the realignment "caused" her to remain at the GS-11 level are just that, conclusory, speculative and unsupported.

In deposition, plaintiff acknowledged that during the almost one year that C&L was realigned into two teams, she retained her GS-11 grade level, maintained her Contract Specialist position, continued to make the same salary, continued to receive cost of living raises, continued to accrue benefits at the same level, continued to work on contracts, and maintained the same supervisor.[2] Stmt of Mat. Facts ¶ 13. In fact, plaintiff acknowledged that during the almost one year realignment, "[e]verything remained at the same level." Stmt. of Mat. Facts ¶ 13.

---

[2] It is important to note that the reason plaintiff was working under the supervision of Mr. Jasper rather than Ms. Klinker was that *plaintiff herself requested* the transfer of supervisors. <u>See</u> Stmt. of Mat. Facts ¶ 6.

Moreover, plaintiff also acknowledged that during the time of the realignment, she continued to perform the duties specified in her position description.  Stmt of Mat. Facts ¶ 13.

In sum, plaintiff's complaint about the realignment is that she "wanted" to work on contracts over $100,000 and "did not want" to work on contracts under $100,000. This claim cannot be sustained – the failure to give an employee "desirable" or "important" work assignments is not an adverse action as a matter of law.   See Bryant v. Brownlee, 265 F. Supp.2d 52, 61 (D.D.C. 2003) (plaintiff's allegation that she was given unimportant work did not rise to the level of adverse employment action); Brown, 199 F.3d at 457 ("mere idiosyncrasies of personal preference"not sufficient to state an injury).  In general, "changes in assignments and work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes."  Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997).  Therefore, plaintiff's complaints about the work assignments she received as part of Team One during the time of the realignment do not rise to the level of an adverse employment action and should be dismissed.

**B.    The Issue About Which Plaintiff Complains Was Remedied Prior To The Time She Filed This Action**

The situation in this case is similar to that involved in Taylor v. Small, 350 F.3d 1286 (D.C. Cir. 2003), in which the D.C. Circuit held that, because the act about which plaintiff complained was corrected prior to the time she filed suit, she could not establish a prima facie case of discrimination.  In Taylor, plaintiff alleged that she had received an erroneous performance evaluation in 1996 and a concomitant loss of bonus money.  Id. at 1289.  In 1999, the plaintiff's supervisor corrected the rating and paid the plaintiff the proper bonus money—before the plaintiff filed suit.  Id. at 1290.  Despite the three-year delay in the plaintiff's

9

receipt of a correct evaluation and the proper bonus money, the D.C. Circuit held that she could

not establish a prima facie case of discrimination.  As the Taylor Court reasoned:  "Because [the

supervisor] corrected her error . . . before [the plaintiff] filed suit, there was no unremedied

adverse employment action when the suit was filed."  Id. at 1294.

By the same token, plaintiff's complaint in this matter acknowledges that "[a]fter a year

of the implementation, of the Division was reorganized back to a more equable [SIC] format

whereby every individual whether African-American or Caucasian, male or female was given

equal opportunity to excel."  Compl. ¶ 22.  Thus, even if plaintiff's complaints about the

realignment did rise to the level of an adverse employment action, the realignment had been

withdrawn prior to the time plaintiff filed suit.  Moreover, in contrast to the three year time span

at issue in Taylor, plaintiff's complaint acknowledges that C&L was realigned back to the way

she wanted in one year.  Accordingly, "[b]ecause [the realignment was] corrected . . . before [the

plaintiff] filed suit, there was no unremedied adverse employment action when the suit was

filed."  Taylor, 350 F.3d at 1294  Therefore, plaintiff cannot establish a prima facie case of

discrimination.

## III.    PLAINTIFF DID NOT EXHAUST HER CLAIM OF GENDER DISCRIMINATION

Federal employees may only file a civil action after exhausting their administrative

remedies before the concerned Federal agency.  42 U.S.C. § 2000e-16(c).  Under rulemaking

authority delegated by Title VII, see 42 U.S.C. § 2000e-16(b), the EEOC has "established

detailed procedures for the administrative resolution of discrimination complaints, including a

series of time limits for seeking informal adjustment of complaints, filing formal charges, and

appealing agency decisions to the Commission."  Bowden v. United States, 106 F.3d 433, 437

(D.C. Cir. 1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  The

EEOC's regulations provide that "aggrieved" employees or applicants for employment who

allege they have been discriminated against must first consult an agency EEO counselor before

filing a complaint of discrimination and must do so within 45 days of the "matter alleged to be

discriminatory or, in the case of personnel action, within 45 days of the effective date of the

action."  29 C.F.R. § 1614.105(a)(1).

     If the matter is not resolved through informal counseling, the aggrieved employee must,

within 15 days, file a written complaint with the agency that allegedly discriminated against him.

29 C.F.R. § 1614.106(a)-(c).  The agency must investigate the matter within 180 days or reject

the complaint and issue a final dismissal.  Id. at § 1614.106(d)(2).  At the conclusion of the

agency's investigation, the complainant may request a hearing before an EEOC administrative

judge or an immediate final decision by the agency.  Id. at § 1614.108(f).  If the employee

chooses the former, the EEOC administrative judge will conduct a hearing and make factual and

legal findings, which will be transmitted to the agency as a recommended decision.  The agency

then issues a final decision.  Id. at §§ 1614.109(g) and .110.

     A complainant who receives a final adverse decision from his agency may appeal that

decision to the EEOC within 30 days, or may file a civil action with 90 days.  If the complainant

appeals to the EEOC, he must file a civil action within 90 days of receiving the EEOC's

decision.  42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.408; see also  Wilson v. Pena, 79 F.3d 154

(D.C. Cir. 1996); Holly v. Secretary of Veterans Affairs, 165 F.3d 244, 246 (3d Cir. 1999).  A

complainant also may file a civil action at any time after his complaint has been pending before

the agency or the EEOC for at least 180 days.  42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.408.

Compliance with these procedures and time lines is mandatory. "Complainants **must** timely exhaust these administrative remedies before bringing their claims to court." Bowden, 106 F.3d at 437; Battle v. Rubin, 121 F. Supp. 2d 4, 7 (D.D.C. 2000) ("a party must timely file all applicable administrative complaints and appeals in order to bring a claim in federal court"); Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative charge is a prerequisite to initiation of a Title VII action"). As the U.S. Supreme Court recently reiterated in Morgan, supra, "'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" 122 S. Ct. at 2070 (quoting Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980)).

As stated by the D.C. Circuit, "the requirement of some specificity in a charge is not a 'mere technicality.'" Park v. Howard University, 71 F.3d 904, 908 (D.C. Cir. 1995), cert. denied, 117 S. Ct. 57 (1996) (quoting Rush v. McDonald's Corp., 966 F.2d 1104, 1111 (7th Cir. 1992)). The enforcement procedures of Title VII represent "a careful blend of administrative and judicial enforcement powers" in which the federal agency plays "a crucial administrative role . . . in the eradication of employment discrimination." Brown v. General Servs. Admin., 425 U.S. 820, 833 (1976). Exhaustion of administrative remedies is required "in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985). Accordingly, the administrative complaint must be sufficiently specific to allow the agency to perform its statutory duty. Park, supra, 71 F.3d at 908. "The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and

'narrow[ing] the issues for prompt adjudication and decision.'" <u>Id.</u> at 907 (<u>quoting</u> <u>Laffey v.</u>

<u>Northwest Airlines, Inc.</u>, 567 F.2d 429, 472 n. 325 (D.C. Cir. 1976)).

Consistent with these purposes, an employment discrimination lawsuit is "limited in

scope to claims that are 'like or reasonably related to the allegations of the charge *and* growing

out of such allegations.'" <u>Park</u>, <u>supra</u>, 71 F.3d at 907 (quoting <u>Chisholm v. U.S. Postal Service</u>,

665 F.2d 482, 491 (4th Cir. 1981)) (emphasis added). Put another way, "claims within a Title

VII suit must be such as could reasonably be expected to be encompassed within an

administrative investigation if one did follow the charge." <u>Id.</u>, n.1.

Plaintiff's formal administrative complaint of discrimination alleges that the realignment

was discriminatory against plaintiff only on the basis of her race, whereas her complaint in

District Court alleges discrimination on the basis of gender also. In deposition, plaintiff clarified

her gender claim – she stated that the realignment was discriminatory against her not just

because she was female, but because she was an "educated, articulate and intelligent" female.

Pltf's Depo. 134:17-134:20. A claim that plaintiff was discriminated against on the basis of her

gender could ***not*** reasonably be expected to have been encompassed within the Library of

Congress' investigation because her formal administrative complaint alleged only discrimination

on the basis of race. Stmt. of Mat. Facts ¶ 15. Nowhere in her formal administrative complaint

did plaintiff allege that she had been discriminated against on the basis of her gender. <u>See</u> Stmt.

of Mat. Facts ¶ 15.

Further, while courts have allowed the inclusion of previously un-referenced <u>acts</u> of

discrimination that "fall[] within the scope of a prior EEO complaint," <u>Waiters v. Parsons</u>, 729

F.2d 233, 235 (3d Cir. 1984), they have not allowed the resurrection or inclusion of abandoned

or never-before-raised <u>theories of discrimination</u>. <u>Compare</u> <u>President v. Vance</u>, 627 F.2d 353

(D.C. Cir. 1980) (Court considered race-discrimination promotion claim where EEO complaint

had alleged only race discrimination in an employment evaluation) <u>with</u> <u>Anthony v. Bowen</u>, 674

F. Supp. 876, 879 (D.D.C. 1986), <u>aff'd</u> <u>in</u> <u>part</u> <u>and</u> <u>rev'd</u> <u>in</u> <u>part</u> 812 F.2d 13 (D.C. Cir. 1987)

(holding that complainant should not be indulged to point of allowing him to resurrect claim he

deliberately abandoned in earlier stage of administrative process) <u>and</u> <u>Siegel v. Kreps</u>, 654 F.2d

773, 778 (D.C. Cir. 1981) (where EEO complaint alleged retaliation, judicial complaint could

not be expanded to include allegations of religion and age discrimination). In fact, such attempts

have expressly been rejected. <u>Sisay v. Greyhound Lines, Inc.</u>, 34 F. Supp. 2d 59, 64 (D.D.C.

1998) (because plaintiff only alleged race discrimination in the administrative complaint, "the

plaintiff's claim of national origin discrimination, raised for the first time in the complaint before

this court, must be dismissed for failure to exhaust administrative remedies"). Under the

reasoning of <u>Sisay</u> and <u>Siegel</u>, plaintiff's allegation that she was discriminated against on the

basis of her gender clearly is a theory of discrimination, which cannot be raised for the first time

in this Court.[3]

## IV.    DEFENDANT HAD A LEGITIMATE, NON-DISCRIMINATORY REASON FOR THE ACTIONS AT ISSUE AND PLAINTIFF CANNOT ESTABLISH PRETEXT

Even assuming <u>arguendo</u> that plaintiff could establish a <u>prima facie</u> case of

discrimination, defendant had a legitimate, non-discriminatory reason for the action at issue and

---

[3] Plaintiff's claim of gender discrimination is also illogical. She acknowledges herself that everyone on Team Two, the team plaintiff was not on, was female. She also acknowledges that her team, Team One was headed by a male and included another male. Thus, her claim that she was assigned to Team One as the result of her gender is entirely without merit.

plaintiff cannot establish that defendant's legitimate, non-discriminatory reason is pretext for discrimination.

**A.      Defendant Had A Legitimate Non-Discriminatory Reason For The Realignment Of C&L**

In early 2001, C&L requested that Martin Contract Management, Inc. ("MCM") perform an efficiency study of C&L. Stmt. of Mat. Fact ¶ 7. In the fall of 2001, MCM completed its study and made its recommendations to C&L management. Stmt. of Mat. Fact ¶ 7. One of MCM's findings was that approximately 70% of the work in C&L involved contracts under $100,000, and 30% of the work involved contracts over $100,000. Stmt. of Mat. Fact ¶ 7. MCM also recommended that, based on the workload, C&L be divided into two sections, one to handle purchases over $100,000 and one to handle purchases under $100,000. Stmt. of Mat. Fact ¶ 7.

C&L management decided to implement the MCM findings and, to do so, hired Ms. Catherine Martin, who was a principle of MCM, as the Acting Chief of C&L and to implement the study's findings. Stmt. of Mat. Fact ¶ 8. Consistent with the MCM study and recommendations, one of Ms. Martin's first actions was to assign one of the two teams to handle purchases over $100,000 and assign the other team to handle purchases under $100,000. Stmt. of Mat. Fact ¶ 9. Consistent with the structure of the office prior to the implementation of the MCM findings, Team One was lead by Mr. Jasper and Team Two was led by Ms. Klinker. Stmt. of Mat. Fact ¶ 9. Team One handled contracts under $100,000 and Team Two handled contracts over $100,000. Stmt. of Mat. Fact ¶ 9. The ***only*** exception to the division of work by dollar value between the two teams was that plaintiff was permitted to continue working on the one contract she was working on previously that was valued at over $100,000. Stmt. of Mat. Fact ¶ 9.

Ms. Helen Mathura and Ms. Ruth Nelson, the two senior grade level contract specialists in C&L were assigned to Team Two, the team led by Ms. Klinker.  Stmt. of Mat. Fact ¶ 10.  The other contract specialists in the office,  including plaintiff, all of whom were junior in grade level to those contract specialists on Team Two, were assigned to Team One, the team led by Mr. Jasper.  Stmt. of Mat. Fact ¶ 10.

Thus, even if plaintiff could establish a prima facie case of race and/or gender discrimination, defendant had legitimate, non-discriminatory reasons for the actions at issue in this matter – the realignment resulted from an efficiency study of C&L and all of the C&L employees assigned to the large purchase section were senior in grade and experience to those assigned to the small purchase section

**B.    Plaintiff Cannot Establish That Defendant's Legitimate, Non-Discriminatory Reason For The Realignment Was Pretext For Discrimination**

Once the defendant has carried the burden of production, the McDonnell Douglas framework is no longer relevant, and "the presumption raised by the prima facie case is rebutted,' and 'drops from the case.'"  St. Mary's Honor Center, 509 U.S. at 507 (quoting Texas Dep't of Community Affairs, 450 U.S. at 255 & n.10 (internal citations omitted).  The burden then shifts back to the plaintiff to establish that the defendant's legitimate, non-discriminatory reasons were not its true reasons but rather were pretextual.  See McDonnell Douglas, 411 U.S. at 802-04; Burdine, 450 U.S. at 252-53.  "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown ***both*** that the reason was false, ***and*** that discrimination was the real reason."  St. Mary's Honor Center, 509 U.S. at 515 (emphasis in original).  "It is not enough, in other words, to disbelieve the employer, the factfinder must believe the plaintiff's explanation of intentional discrimination."  Id. at 519.  Plaintiff bears the ultimate burden of

16

persuasion on the issue of whether he was intentionally discriminated against. <u>Burdine</u>, 450 U.S. at 253.

Even if a Court suspects that a plaintiff was victimized by a bad decision, "it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" <u>Fischbach</u>, 86 F.3d at 1183 (D.C. Cir. 1996) (quoting <u>Milton v. Weinberger</u>, 696 F.2d 94, 100 (D.C. Cir 1977)) ("It is axiomatic that under the statutory scheme of Title VII … an employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as racial or other discriminatory distinctions do not influence the decision."), <u>aff'd</u>, 595 F.2d 888 (D.C. Cir. 1979). "Once the employer has articulated a nondiscriminatory reason for its actions … the issue is not "the correctness or desirability of [the] reasons offered … [but] whether the employer honestly believes in the reason it offers." <u>Fischbach</u>, 86 F.3d at 1183 (internal quotation marks and citations omitted). "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." <u>Pignato</u>, 14 F.3d at 349 (quoted in <u>Fischbach</u>, 86 F.3d at 1183).

Further, "[t]o avoid summary judgment, the plaintiff [is] required to produce some <u>objective evidence</u> showing defendant's proffered reasons are mere pretext." <u>Batson v. Powell</u>, 912 F. Supp. 565, 578 (D.D.C. 1996), <u>aff'd</u>, 203 F.3d 51 (D.C. Cir. 1999) (emphasis added). Nor may a plaintiff create a factual issue of pretext merely on personal speculation of discriminatory or retaliatory intent. <u>Greene v. Dalton</u>, 164 F.3d 671, 675 (D.C. Cir. 1999) ("a mere unsubstantiated allegation … creates no genuine issue of fact and will not withstand summary judgment." ) (quoting <u>Harding v. Gray</u>, 9 F.3d 150, 154 (D.C. Cir. 1993)); <u>see also</u> <u>Settle v. Baltimore County</u>, 34 F. Supp.2d 969, 976 (D. Md. 1999) (citing <u>Felty v. Graves-</u>

17

Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) ("[r]ecent cases of the Supreme Court have made increasingly clear, however, the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial") (citations omitted)); Phillips v. Holladay Property Services, Inc., 937 F. Supp. 32, 35 n.2 (D.D.C. 1996), aff'd, 1997 WL 411695 (D.C. Cir. 1997) ("[A] plaintiff's denial of defendant's articulated legitimate reason without producing substantiation for the denial is insufficient to withstand a motion for summary judgment.").

In the case at bar, plaintiff cannot possibly establish pretext because the undisputed facts show that the reason for the realignment of C&L had absolutely nothing to do with discrimination. Instead, the realignment was the result of an efficiency study, and the findings of that study, conducted by MCM in 2001. Plaintiff cannot establish that this reason for the realignment is a pretext for discrimination because she **concedes** that this fact is accurate. Stmt. of Mat. Facts ¶ 7. Moreover, plaintiff was assigned to Team One, the team led by Mr. Jasper for two reasons: (1) she requested to be reassigned to his team prior to the realignment, see Stmt. of Mat. Facts ¶ 6, and (2) the team members of Team Two, the team assigned to handle the larger contracts, were the senior level C&L employees, whereas the remaining employees were assigned to Team One, see Stmt. of Mat. Facts ¶ 10. Again, plaintiff cannot establish that these reasons for the assignment of personnel within C&L are a pretext for discrimination because she concedes that they are accurate.[4] Thus, even if plaintiff could establish a prima facie case of race and/or gender discrimination, defendant had legitimate, non-discriminatory reasons for the

---

[4] Plaintiff also acknowledges that the realignment simply realigned C&L in the same way it had been prior to August 1998. Stmt. of Mat. Facts ¶ 4.

18

actions at issue in this matter and plaintiff cannot show that defendant's reasons are a pretext for discrimination.

## **CONCLUSION**

For the foregoing reasons, defendant James Billington, in his official capacity as Librarian of Congress, respectfully request that the Court grant summary judgment in his favor.

19

October 12, 2006                            Respectfully submitted,


                                           _____/s/_____
                                           JEFFREY A. TAYLOR, D.C. Bar # 489610
                                           United States Attorney


                                           _____/s/_____
                                           RUDOLPH CONTRERAS, DC BAR #434122
                                           Assistant United States Attorney


                                           _____/s/_____
                                           JOHN F. HENAULT, D.C. Bar # 472590
                                           Assistant United States Attorney
                                           555 4th Street, N.W.
                                           Washington, DC 20530
                                           (202) 307-1249
                                           (202) 514-8780 (facsimile)

20