**ORIGINAL**

1

## VOLUME 1

HEARING PROCEEDINGS

- - - - - - - - - - - - - - - - - - x
:
In the Matter of:                    :
:
VALDA C. MURFREE-FLEMING,            :
:
        Complainant,           :
                                 : EEO No. 02-61
   versus                            :
:
THE LIBRARY OF CONGRESS,             :
:
        Respondent.            :
:
- - - - - - - - - - - - - - - - - - x

                       Washington, D.C.

                       Thursday, August 12, 2004

    Proceedings took place, by agreement of the parties on Thursday, August 12, 2004, at 10:09 a.m., at the Library of Congress, James Madison Memorial Building, Room LM-139, 101 Independence Avenue, S.E., Washington, D.C.

    BEFORE:

        LOIS HOCHHAUSER, Esq., Hearing Examiner

PRO-TYPISTS, INC.
Professional Transcription Service
Washington, D.C.
(202) 347-5395
www.pro-typists.com

APPEARANCES:

    On behalf of the Complainant:

        BOBARA E. LILES, Esq.
        11309 Indian Wells Lane
        Mitchellville, Maryland 20721

    On behalf of the Library:

        EVELIO RUBIELLA, Esq.
        Assistant General Counsel
        JESSIE JAMES, JR., Esq.
        Associate General Counsel
        Library of Congress
        James Madison Memorial Building
        Room LM-601
        101 Independence Avenue, S.E.
        Washington, D.C. 20540

ALSO PRESENT:

        VALDA C. MURFREE-FLEMING
        NATHAN GROW
        WANIKA ADAMS

                  - - -

3

## W I T N E S S E S

| Complainant | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Valda Murfree-Fleming | 18 | 67 | 92 | - |
| Napoleon Jasper | 98 | - | - | - |
| Julius Dow | 122 | - | - | - |
| Debra Murphy | 191 | 212 | - | - |

**Respondent**

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Gary Columbia | 136 | 160 | 187 | 190 |
| Catherine Martin (via telephone) | 219 | 227 | 252 | - |

## E X H I B I T S

| Joint | Identification | In Evidence |
|---|---|---|
| 1   EEO Investigative File | 59 | 59 |

**Agency**

| | Identification | In Evidence |
|---|---|---|
| 1   Vacancy Announcement, Contract Specialist | 73 | withdrawn |
| 2   11/7/99 Performance Rating | 82 | 84 |

**Employee**

| | Identification | In Evidence |
|---|---|---|
| 1   8/16/01 Memo, Washington to Service Unit Directors | 126 | 127 |

4

## P R O C E E D I N G S

THE HEARING EXAMINER: Good morning, everybody. My name is Lois Hochhauser, I'm the hearing examiner assigned to this matter, and this is the matter of Valda Murfree-Fleming and the Library of Congress. The EEO Case Number is 02-61.

What I'd like to do is go around at room at this point and starting from my left, ask you each to identify yourselves for the record with your name and your relationship to this proceeding.

MS. LILES: Good morning. My name is Bobara Liles, that's spelled L-i-l-e-s, and I am the attorney for Valda Murfree-Fleming.

THE COMPLAINANT: Good morning, I am Valda Murfree-Fleming.

MR. JAMES: Jessie James, Jr., Associate General Counsel, Library of Congress, representing the Library of Congress.

MR. RUBIELLA: Evelio Rubiella, Assistant General Counsel, Library of Congress.

MR. GROW: Nathan Grow, intern with the Office of the General Counsel of the Library of

1    any other questions for this witness?

2        MS. LILES:  No.

3        MR. RUBIELLA:  No.

4        THE HEARING EXAMINER:  Thank you very much,

5    you're excused.  Now you have another witness.  You

6    need to tell me what you think you want to do.  And I'm

7    also going to tell you the problem I'm having with one

8    of these documents.

9        MR. RUBIELLA:  Sure.

10       THE HEARING EXAMINER:  But let's go off the

11   record while you tell me what you want to do.

12       (Discussion off the record.)

13       THE HEARING EXAMINER:  Ms. Martin, my name is

14   Lois Hochhauser.  I'm the hearing examiner in this

15   case.  Can you hear me clearly?

16       MS. MARTIN:  Yes, I can.

17   Whereupon,

18                    CATHERINE MARTIN

19   having been called as a witness by Counsel for the

20   Respondent, and having been duly sworn by the Hearing

21   Examiner, was examined and testified via telephone as

22   follows:

1   Representatives, the United States Capitol Police and
2   the Library of Congress, and I've been floating for the
3   last ten years in legislative agencies.
4   Q   Okay, just as a point of clarification, can
5   you state your first name again?
6   A   My first name is Catherine, it's spelled with
7   a C-a-t-h-e-r-i-n-e is the proper name.
8   Q   Okay, thank you. Did there come a time when
9   you came to the Library of Congress to do an assessment
10  on behalf of one of its divisions?
11  A   Yes, that is absolutely correct. I have my
12  own company, it's called Martin Contracts Management,
13  and we were hired to come in and do an assessment for
14  one of the divisions, if not a few of the divisions, I
15  don't know the exact time frame, to do an assessment,
16  the assessment being categorized as, "What is the
17  health of your business activities?"
18  Q   Okay. Now with regards to the Contracts
19  Section, do you recall what your recommendations were
20  with regards to how that organization should be set up?
21  A   There was a report that was provided to the
22  division with the recommendation that the workload

1  needed to be realigned to the customer base, as well as
2  a better workload distribution for the number of
3  procurement actions.
4  Q   Why did you and your report feel that any
5  changes at all should be implemented?
6  A   Well, there was an uneven load, there was an
7  uneven distribution of the workload.  By that, I mean
8  that some contracts personnel [telephone line breakup]
9  actions because it was done to the division or the
10 department and other people were overburdened.
11      In order to make an assessment, you need to
12 determine what type of work is being processed for the
13 organization.  Our analysis showed that approximately
14 70 percent of the workload coming into the procurement
15 area was under $100,000.00 in value and 20 percent,
16 which would take it to 90 percent, was anything over
17 $100,000.00, which divides it into commercial item
18 acquisition or to larger procurements.  The other ten
19 percent was contract close-out work.  So based on that,
20 you should put people to where the workload is.
21 Q   Okay, now I'll return to that question and
22 that theme in a moment, but I'd like to ask you first,

1   after your assessment and your recommendation, did
2   there come a time when you became the acting head of
3   Contracts?
4       A    That's absolutely correct.
5       Q    And when you became acting head of Contracts,
6   did you implement some of those recommendations that
7   you had mentioned in your assessment?
8       A    That's precisely right.
9       Q    Okay.  Was one of those recommendations or
10  one of those moves on your part, was that to split up
11  the contracts specialists into two teams?
12      A    Yes.
13      Q    And am I correct in understanding that one of
14  those teams would handle small purchases under
15  $100,000.00 and the other team would handle contracts
16  over 100,000, is that correct?
17      A    Yes, it was divided by the $100,000.00 mark,
18  but it would be correct to think that everything -- I
19  mean the small purchases has a connotation that it is
20  just that.  In the procurement world, small purchases
21  are classified as anything under $100,000.00.  They
22  could be a BPA, it could be a contract, it could be a

224

1   purchase order, it could be a credit card buy.

2   Q   Okay.  Now in making those two teams or in
3   deciding who would be on those two teams, what did you
4   use as the basis as far as assigning people to those
5   two teams?

6   A   There were two concepts that were used for
7   who went on the teams.  First of all, it was divided by
8   the workload.  If 70 percent of a hundred percent -- we
9   had ten people at that time.  If 70 percent of the
10  workload was under what we call $100,000.00 or small
11  purchases, then legitimately, by calculation, seven
12  people should go to that team, leaving the other three
13  people to handle everything over $100,000.00.

14          There were three people within the department
15  at that time that were handling the majority of the
16  actions over $100,000.00, so that stayed in effect and
17  everyone else was just put into Team 1.  We divided it
18  into Team 1 and 2.  And the other reason for that
19  decision is there were only two supervisors.

20  Q   Okay, the three people that were left, as you
21  say, or placed in the Team 2, which was the one over
22  $100,000.00, would that have been Kaye Klinker, Helen

1  Mathura and Ruth Nelson?

2      A    That's correct.

3      Q    Now in assigning people to those two teams,
4  was race a factor in your decision as far as those
5  assignments?

6      A    No.

7      Q    What about gender?

8      A    No.

9      Q    Okay.  Now in your observation -- excuse me,
10 how long were you there as head of Contracts, again?

11     A    One year.

12     Q    One year.  Did you have a desire to stay
13 there as a permanent?

14     A    That's a tough question.  I did consider it,
15 but my decision was to return to my own business and go
16 on with other activities.

17     Q    So you were only there a year and you
18 implemented these changes, is that correct?

19     A    I attempted to, yes.

20     Q    You said you attempted to.  Did you in fact
21 not divide the contract specialists up into two teams?

22     A    Well, I did, but there was more to the

240

```
 1   contracts.
 2        A    In the what?
 3        Q    In the large procurement contracts.
 4        A    Team 2?
 5        Q    Yes.
 6        A    That's correct.
 7        Q    All right.  Did you take into consideration
     anyone's educational background at that time in making
     the decision as to who was to go where?
10        A    We took into effect the experience level and
     the capabilities of the people, the experience level.
12        Q    And what was the experience level of Valda
     Murfree-Fleming?
14        A    Valda had been working on many items that
     were under $100,000.00.
16        Q    And what about her educational background?
17        A    Valda once told me that she had a Ph.D.
18        Q    That she had a Ph.D.?
19        A    Yes.
20        Q    Did you have occasion to look at her file or
     anything of that nature?
22        A    No.  To verify the Ph.D.?  No.
```

1  make you upset about this.

2      A    Well, I think it's a very negative culture

3  there. I'm not sure why anybody would really want to

4  stay, but I had a choice, so my choice was not to stay.

5      Q    Okay, thank you, I appreciate it.

6      THE HEARING EXAMINER: I have some questions

7  for you. This is Lois Hochhauser. We have a large

8  investigative file here with a number of different

9  lists of employees who were part of the teams at

10 various points in time. Can you hear me?

11     THE WITNESS: Yes, I can.

12     THE HEARING EXAMINER: Okay, now it's my

13 understanding that you were responsible for appointing

14 the two different teams, the team that worked on

15 contracts under $100,000.00 and the team that work on

16 contracts over $100,000.00. Is that correct?

17     THE WITNESS: Yes.

18     THE HEARING EXAMINER: For the team that

19 worked under $100,000.00, who was your team leader?

20     THE WITNESS: The team leader was Napoleon

21 Jasper, he was a contracting supervisor.

22     THE HEARING EXAMINER: For under $100,000.00.

244

1   THE WITNESS: That's correct.
2   THE HEARING EXAMINER: And who was your team
3   leader for contracts over $100,000.00?
4   THE WITNESS: Kaye Klinker, who was also a
5   contracting supervisor.
6   THE HEARING EXAMINER: Okay, and what made
7   you choose Mr. Jasper as the under $100,000.00 and
8   Klinker as the over $100,000.00?
9   THE WITNESS: Kaye was selected as the
10  Team 2, for over $100,000.00, because that's the area
11  that she worked in all the time and she was the
12  supervisor, so --
13  THE HEARING EXAMINER: And what area had Mr.
14  Jasper worked in all the time?
15  THE WITNESS: I think -- pardon?
16  THE HEARING EXAMINER: I asked you what area
17  did Napoleon Jasper work in.
18  THE WITNESS: I believe he worked in all of
19  the contract areas, over and under.
20  THE HEARING EXAMINER: So he worked over and
21  under and you put him in the under?
22  THE WITNESS: That's correct.