**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

VALDA MURFREE-FLEMING                    :

            Plaintiff,                    :

v.                    :          No. 05-1180(HHK)

JAMES H. BILLINGTON,                    :
In his official capacity as                    :
Librarian of Congress,                    :

            Defendant                    :

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION</u>**

**<u>FOR SUMMARY JUDGMENT</u>**

       Pursuant to Federal Rule of Civil Procedure 56, plaintiff Valda Murfree-Fleming, through the undersigned attorney, hereby moves this Court to deny defendant's Motion for Summary Judgment in his favor.  The plaintiff submits that there are genuine issues of fact and that defendant is not entitled to judgment as a matter of law.

       I n support of this motion, plaintiff respectfully refers the Court to the accompanying memorandum of points and authorities which supports plaintiff's position that there are genuine issues of fact that need to be tried by a trier of fact.   A draft order denying defendant's Motion for Summary Judgment is attached.

                      Respectfully Submitted,

                      _____

                      Bobara E. Liles, Esq.

                      11309 Indian Wells Lane

Mitchellville, Md. 20721
(301) 350-0991
Attorney for Plaintiff
 (Bar #952002)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13TH day of November 2006, a true and correct

copy of the above forgoing **PlAINTIFF'S OPPOSITION TO DEFENDANT'S**

**MOTION FOR SUMMARY JUDGMENT** was hand delivered to:

> John F. Hernault
> Assistant United States Attorney
> Judiciary Center
> 555 Fourth Street, NW
> Washington, D.C. 20001

_____

Bobara E. Liles, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **VALDA MURFREE-FLEMING** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| | ) | **No. 05-1180 (HHK)** |
| | ) | |
| **JAMES H. BILLINGTON,** | ) | |
| **In his official capacity as** | ) | |
| **Librarian of Congress,** | ) | |
| | ) | |
| **DEFENDANT** | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Valda Murfree-Fleming, through the undersigned attorney, respectfully submits this memorandum in support of her opposition to Defendant's Motion for Summary Judgment.

**STATEMENT OF THE CASE**

Plaintiff brings this case under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. section 2000e, et seq.  Plaintiff submits that she was discriminated against   by the Library of Congress (herein after referred to as "Library" or "defendant") based on her race and gender when the Library implemented a reorganization of the Integrated Support Services, Contracts and Logistics Services ("Division").  The reorganization eliminated Plaintiff's potential for advancement in her career at the Library.  Specifically,  contracts whose values were over $100,000 were reassigned to a team consisting of only Caucasian females, while contracts involving amounts under $100,000 were assigned to a team consisting of all African-Females.

## **FACTS**

_____Plaintiff incorporates by reference it's responses to Defendant's Statement of Material Facts not in Dispute.

_____Plaintiff Murfree-Fleming ("Plaintiff"), a Contract Specialist (GS-11) was discriminated against by the Library of Congress ("Library") based on her race and gender when Ms. Washington, her second level supervisor, implemented a reorganization of her Division.  The reorganization eliminated Plaintiff's potential for promotion.   Contracts that were over $100,000 were assigned to a team consisting of only Caucasian females, while contracts involving amounts under $100, 000 were assigned to Plaintiff's team which consisted of all African-American females.

The specific facts of the case are that Ms. Murfree-Fleming started working at the Library of Congress in 1991. Her first position at the Library was a supervisor in the Copyright Office.  After working in that position for several years she applied for the Affirmative Action Program.  From there she was given the opportunity to go into contracts.  It was her understanding at the time that she entered the program that she would first work on contracts involving amounts that were under $100,000, but eventually she would be assigned to contracts that involved amounts over $100,000.   From 1991 to 1993, plaintiff worked primarily on small contracts.  In 1995 Debra Murphy became Plaintiff's supervisor.  Ms. Murphy observed that only the Caucasian females were working on the large contracts.  Ms. Murphy 'leveled the playing field' by dividing the Division into two teams.  First she made sure each time was racially mixed.  Then she instructed the team leader for each team to train and give the African-American employees large contracts.  To her dismay,  Plaintiff's team leader refused to train Plaintiff. As a result, Plaintiff requested that she be moved to Mr. Napoleon Jasper's team, whereupon she was trained and given large contracts to handle.

Plaintiff career at the Library moved along smoothly until 2001. At that time her second level supervisor, Linda Washington, an African-American female, advised her that the changes made by Ms. Murphy were going to be undone and she was going to be placed back in the Procurement and Contracts Section where she would no longer handle large contracts. At the meeting where the staff was advised of the reorganization, Plaintiff asked Ms. Washington the following: If they were going back to the old way the library was. She did not receive a satisfactory response. Pltf's Depo. Page 105:18-105:21.

Linda, do you mean that we're going back to the original organization, where all the black people are on one team, small purchases, and all whites are on..... Does this mean that we're not going to be able to get our promotions?" To Plaintiff's dismay, Ms. Washington reply was that she was not interested in promoting her.

Despite, Plaintiff's objections the Division was reorganized and Ms Murphy was removed as Chief of the Division and her position was abolished. Plaintiff was forced to give up all her large contracts except for one. Plaintiff testified that the reorganization left her very depress, making it necessary for her to seek and receive medical treatment. In addition, Plaintiff felt betrayed by the Library because she felt that her supervisors knew that she had completed her Master Degree with the intent to be an even bigger asset to the Library. However, the Library's actions caused Plaintiff to be stuck at the GS level for approximately five years despite receiving excellent and outstanding evaluations.

Eventually, Ms. Catherine Martin, whose company was the author of the reorganization plan (The Martin Report) that placed all the African-American on the small contract team became chief of the Division. However, when she left, the

Library recognized the inequablity of the two segregated teams and ended the two team system.  As a result, large contracts were again distributed to everyone.

Plaintiff contends that the Library conspired against her also based on her sex.  Every African-American female that was on either a major career path or was two out spoken was moved from the Division.

Plaintiff is also seeking reimbursement for the tuition for her Master's degree.  She obtained permission from the Library to study the Procurement Office. Plaintiff did her Master's thesis on the Procurement Office. Despite her numerous requests for reimbursement, she has yet to receive compensation for her job related Masters.

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists

no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). If there is "any evidence in the record from any source from which a reasonable inference in the [nonmoving party]'s favor may be drawn, the moving party simply cannot obtain a summary judgment ..." In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 258 (1983) (rec'd. on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).)

In other words, the Defendant must establish a right to summary judgment by showing that the pretrial record demonstrates that the defendant is entitled to judgment as a matter of law. Therefore, defendant must show that no reasonable fact-finder at trial could fail to regard the defendant as having discharged its

preponderance of the evidence burden. See,  Edison v. Reliable Life Ins. Co, 664 F.2d 1130, 1131 (9th Cir. 1981) (to obtain summary judgment in its favor, defendant must prove no realistic possibility that the  fact-finder will find that the facts are at issue and that the dispute  and dispute must be resolve around legal effects of language.)

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. See T.W. Elec. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See Falls Riverway Realty. Inc. v. City of Niagara Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979

In this case there are genuine issues of fact.  Plaintiff contends that she was discriminated against when her Division was reorganized by the defendant. Defendant on the other hand states that its action in reorganizing the Division was not discriminatory and if it was it was remedied prior to Plaintiff filing her complaint and did not effect Plaintiff's career path.  This clearly indicates a genuine conflict in the facts in this case.

## II.    PLAINTIFF CAN ESTABLISH A PRIMA  FACIE CASE OF DISCRIMINATION

The record in this case clearly establishes that Plaintiff has established a prima facie case of discrimination.   In order to establish a prima facie case of discrimination, the Complainant must prove that:

1. He/she is a member of a protected class,

2. The complainant experienced an adverse action, and

3. The complainant was treated differently than similarly situated individuals not in her protected class under similar circumstances.

In this action, Plaintiff is a member of a protected class (African-American) secondly the Plaintiff experienced an adverse action, and lastly she was treated differently than similarly situated individuals (the Caucasian females) in her protected class under similar circumstances.

The prima facie elements for disparate treatment (treating someone differently based on gender) are the same as for race, color, or national origin discrimination. To make a prima facie case of gender discrimination, the complainant must show that the challenged practice or policy disproportionately impacted members of his/her protected class.  Specifically, the complainant must:

1. Identify the specific practice or policy challenged;

2. Show a statistical disparity; and

3. Show that the disparity is linked to the challenged policy or practice.

In this case, due to the discriminatory reorganization of the Division, Plaintiff an African-American female was forced to give up all her major contracts except for one that was specifically assigned to her.  All the African-American females were moved to a team handling only contracts valued under $100,000.

**A.    The Reorganization Did Effect the Terms And/or Condition Of Plaintiff's Employment**

The reorganization of Plaintiff's Division did in fact effect the terms and condition of Plaintiff's employment. Since 2001, Plaintiff was involved in handling both large and small contracts. The Martin Report changed that. Plaintiff without her permission or input was placed on a team that only handled contracts under $100,000. This was a change in the terms and conditions of her employment. There is a change in the conditions of ones employment when an employee is doing a high level of work and then suddenly is reverted back to an entry level of work. Then within one year the condition of her employment was changed again to where she was once again handling a mixture of cases. The Library's actions show that it did not respect any work or job plan, it directed its employees to do what ever work it wanted to them. With the reorganization Plaintiff was put on a team based solely on her race. Plaintiff had the education, experience[1] and education to handle large contracts.

Plaintiff in this matter does not need to show that the reorganization involved a diminution in pay or benefits. In Herrnreiter v. Chicago Housing Authority, 313 F.3d 742, 744-45 (7th Cir. 2002) the Court determined that discrimination can be found where a "nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced." In this case, Plaintiff submits that in this case the reorganization resulted in more than a lateral move as referred to in Herrnreiter. In this case, the reorganization resulted in major changes which significantly reduced Plaintiff's career prospects by preventing her from using skills in which she was trained and experienced and

---

[1]Prior to the reorganization, Plaintiff had gained a great deal of hands on experience under her former supervisor.

made her significantly less competitive for promotion.  Rodriquez v. Board of
Education, 620 F.2d 362, 364-66 92nd Cir.1980.

**B.    Plaintiff Is Entitled To Continue Her Lawsuit Against the Defendant
Despite The Fact That The Defendant Remedied The Discrimination
Prior to the Time Plaintiff Filed Her Complaint.**

Defendant contends that because Plaintiff filed her complaint after the
Division had reverted back to its discriminatory she should not be allowed to
continue her lawsuit.   Plaintiff disagrees with this position.  Defendant should not
be allowed to escape prosecution because after a year of engaging in a
discriminatory act, defendant saw the error of its ways.  This is not a case where
the employer remedied the discriminatory practice on its own.  There was much
dissatisfaction among the discriminated employees and challenges by the union.[2]
In addition, Plaintiff was not made whole by the Division reverting back to the
non-discriminatory organization of the Division.

By being placed on the small procurement team, Plaintiff was denied the
opportunity to obtain additional experience and expertise, making her less
competitive.   At the Library there are few job openings and many qualified
employees competing for the same slot.  Therefore someone relegated to small
procurements would have a more difficult time obtaining a position when an
infrequent position became available.  Thus even as today, Plaintiff is at least one
year behind in handling large contracts. Making it her difficult to compete against
her Caucasian colleagues.

Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir.1999) permits a finding of
discrimination based on subtle conduct or decisions.   Pursuant to Brody, Plaintiff

---

[2]The Library implemented the reorganization without obtaining approval from the union.

has establish by way of the record that she was a member of a protected class; that she suffered an adverse employment action, and that the unfavorable action gave rise to an inference of discrimination.

## III.   PLAINTIFF DID EXHAUST HER CLAIM OF GENDER DISCRIMINATION

Plaintiff has consistently stated that she was discriminated by race and gender. In the investigated report for her case the investigator asked several witnesses about whether or not she had been discriminated based on her race and sex as an African-American female.  Plaintiff even testified at the administrative hearing concerning the discrimination against her by the Library.

Further, in the post-administrative briefs both the Library and Plaintiff argued gender discrimination.  In addition, the Administrative Judge addressed this issue in her decision.   Therefore,  Plaintiff contends that she has exhausted her claim of gender discrimination at the "agency" level.  The Library was aware of this portion of Plaintiff's case at all times,  and as a result should not now be allowed to use a written technicality to have this portion of her complaint be dismissed.  In short, Plaintiff contends that defendant has waived the right to have this portion of the complaint dismissed.

## IV.   DEFENDANT DID NOT HAVE A LEGITIMATE NON-DISCRIMINATORY REASON FOR THE ACTIONS AT ISSUE

### A.    Defendant Did Not Have A Legitimate Non-Discriminatory Reason For the Reorganization of The Division[3]

---

[3]In defendant's Motion, the reorganization is referred to as a realignment. (Deft. Motion, p. 15)  We disagree. The Martin Report did more then realigned the Division, it completely changed the structure of the Division.  The changed effected the career path of all the African-American females in the Division.

**B.**    **Plaintiff <u>Can</u> Establish That Defendant's Reasons For The Reorganization Was Pretext For Discrimination.**

Defendant did not have a legitimate, non-discriminatory reason for the reorganization of the Division. By adopting the Martin Report, the Library completely changed the format of the Division. The team personnel make-up was changed. The nature of the team work was changed   Personnel were moved from racially mix team to teams based on color.  Then a year after the Report had been implemented the Division was reorganized back to the more equitable format where every individual whether African-American, Caucasian, male or female was given equal opportunity to excel.  Further Mrs. Martin, the author of the Martin Report, who had been hired to implement the reorganization, left the Library based on the huge resentment of the staff due to the discriminatory nature of the reorganization.[4]

The implementation of the Martin Report was clearly discriminatory. Plaintiff submits that Defendants actions was materially adverse as it applied to African-American females. See, Burlington Northern and Santa Fe. Railway Co. V. White, _S.CT_, 2006 WL 1698, 953 (June 22, 2006. )  Plaintiff's supervisors knew that the reorganization would made the teams segregated.  However, it took union and employee outraged, and a change in management of the Division to change the Division back to where it had been. Moreover, this case does not a situation where the Defendant can allege that the reorganization was merely a decision that was wrong or mistaken.  <u>Fuentes</u> , 32 F.3d at 765.

Plaintiff has established the elements required to sustain her burden that the reorganization was <u>prima</u> <u>facie</u> discriminatory.  The Plaintiff submits that the

---

[4]Plaintiff is not the only employee to file a complaint against the Library due to the reorganization

defendant cannot and has not "'articulate(d) some legitimate, nondiscriminatory reason for its reorganization pursuant to the Martin Report. " <u>Fuentes v. Perskie</u> , 32 F.3d 759, 763 (3d Cir. 1994) (quoting <u>McDonnell Douglas Corp. v. Green</u> ,

<u>411 U.S. 792,802</u> ); <u>see also Sheridan v. E.I. DuPont de Nemours & Co.</u> , 100 F.3d

 1061 (3d Cir. 1996)(en banc). Defendant's proffered justifications are suspicious and not worthy of credence and that the true reason for the Library's act was discrimination.  This inference, along with the components of the Plaintiff's prima facie case, will allow a trier of fact to conclude that the employer was actually motivated by illegal bias. <u>See Sheridan</u> , 100 F.3d at 1066-67.  Therefore.

Defendant is not entitled to a motion for summary judgment as a matter of law.


### RELIEF SOUGHT

Plaintiff through this lawsuit is seeking the following:

1.    $300,00 in compensatory damages due to the deliberate infliction  of emotional distress caused by the Library's prior discriminatory  pattern and practice, to offset the set back in her career advancement, and to help offset the damage to her health and well being.

2.    Payment of her attorney fees and expenses;

3.    Immediate promotion to a Grade 14 and reimbursement for back pay, and awards that Plaintiff would have received but for the discriminator reorganization of her Division into the Caucasian Team and the African-American Team;

4.    Reimbursement for tuition personally paid by Plaintiff to improve her career opportunities and to satisfy the educational requirements for all contracting officials.


## SUMMARY

In this case Plaintiff has shown that there are genuine issues of material fact.  Plaintiff submits that there is sufficient evidence to allow a reasonable jury to find for her at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The record in this case supports this Court giving Plaintiff the benefit of all reasonable inferences.  Sempier, 45 F.3d at 727; Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1413 (3d Cir. 1991).

**WHEREFORE**, Plaintiff respectfully requests that defendant's Motion for Summary Judgement be denied.

Respectfully Submitted,

/s/_____
Valda Murfree-Fleming


/s/_____
Bobara E. Liles, Esq.
11309 Indian Wells Lane
Mitchellville, Md. 20721
(301) 350-0991
Attorney for Plaintiff
(Bar #952002)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of November, a true and correct copy of the above forgoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was mailed, first, class prepaid.**

John F. Hernault
Assistant United States Attorney
Judiciary Center
555 Fourth Street, NW
Washington, D.C. 20001

/s/ _____
                            Bobara E. Liles, Esq.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **VALDA MURFREE-FLEMING** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **No. 05-1180 (HHK)** |
| | ) | |
| **JAMES H. BILLINGTON,** | ) | |
| **In his official capacity as** | ) | |
| **Librarian of Congress,** | ) | |
| | ) | |
| **DEFENDANT** | ) | |
| _____ | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Federal Rules of Civil Procedure 56 and Local Civil Rule 7(h), defendant submits this statement of material facts as to which she contends there is genuine issues of fact.

1. Plaintiff first began her employment with the Library of Congress in 1991 as a supervisor of the correspondence unit for the Copyright Office. Deposition of Valda Murfree- Fleming 12:7-12:9 ("Pltf's Depo") (Exhibit 1).

RESPONSE: Plaintiff agrees with this stated material fact.

2. On October 16, 1994, plaintiff transferred from the Copyright Office to become a GS-7 Professional Development Associate/Affirmative Action Associate with the Office of Affirmative Action/Special Programs. Pltf's Depo. 12:21-12:24; Exhibit 2 (October 16, 1994 SF-50).

RESPONSE: Plaintiff agrees in part with the defendant's alleged material fact. Plaintiff contends the following. Although Plaintiff was assigned to the program as a Professional Development Associate/Affirmative Action Associate under that office, she was physically assigned to the Contracts and Logistic's Office. Pltf's Depo. Page 71; Exhibit

3.  On October 15, 1995, plaintiff transferred from the Professional Development Associate position to become a GS-1102-9 Procurement Specialist in the Library's Contracts & Logistics Office ("C&L").  Plaintiff's position as a Procurement Specialist was a career ladder position that began at the GS-7 level and progressed to the GS-11 level. Accordingly, as of November 10, 1996, plaintiff had reached the maximum grade level she could without having to apply for and compete for a promotion.

RESPONSE:  Plaintiff disagrees with the defendant's alleged material fact. Plaintiff contends that she should have automatically had the opportunity to progress to the GS-12 level.  The previous associate, Michel Baytop entered the program and was assigned to C&L as she and automatically advanced to the GS-12 level without competition.  The plaintiff was promised by her supervisor, Gary Columbia that the same would occur with her.  Pltf's Depo.Page 21-24

4.  At the time plaintiff joined C&L, the section was divided into two sections, one handled "large purchases," which were purchases over $50,000, and the other "small purchases," which were purchase under $50,000.  Plaintiff was on the team that handled small purchases.

RESPONSE: Plaintiff disagrees with the defendant's alleged material fact. Plaintiff contends that although the work was separated according to the dollar amount that there were no distinct numbered teams, such as team one and two.  But that the employees who awarded small purchases sat on one side of the office while the employees who awarded large contracts sat on the opposite side of the office.  It was her understanding that once assigned to Small Purchases, and after mastering those duties that she would automatically begin to process large purchases as the former associate had done. Pltf's Depo. Page 73

5.  In approximately August 1998, C&L was realigned and the large and small purchase s section were integrated, although there were still two teams.  Under this realignment, plaintiff began working on contracts that were over $100,000.  In approximately 2000, Ms. Kaye Klinker became the team leader of the team on which plaintiff was working.

RESPONSE: Plaintiff agrees with the defendant's alleged material fact in part. Plaintiff contends that she is not aware of a realignment occurring.  She recalls that Ms. Debra Murphy instructed the senior contracting officers to partner with the small purchase contracting specialists and that they were to work on large contracts collectively.  But the senior contracting officers were reluctant and consequently plaintiff was only allowed to attend a meeting with one of the seniors, but was never allowed to work on that contract which was later awarded to the Ad Council.  Ms. Klinker later became the Plaintiff's team leader. Pltf's Depo. Page 74

6.  Plaintiff was not happy on Ms. Klinker's team and requested to be, and was transferred to the other team, which was led by Mr. Napoleon Jasper.

RESPONSE: Plaintiff disagrees with the defendant's alleged material fact in part. Plaintiff contends that she was never unhappy, but was dissatisfied with Mrs. Klinker's

ability to manage a professional employee.  Plaintiff had many years of experience as a manager and felt that Ms. Klinker was not allowing her to progress according to the goals listed in her personal development plan under the Affirmative Action Program.  Pltf's Depo. Page 79:8-79:11

7.  In early 2001, C&L requested that Martin Contract Management, Inc. ("MCM") perform an efficiency study at C&&.  In the fall of 2001, MCM completed its study and made its recommendations to C&L management.  One of MCM's findings was that approximately 70% of the work in C&L involved contracts under $100,000, and 30% of the work involved contracts over $100,000.  MCM also recommended that, based on the workload , C&L be divided into two sections, one to handle purchase over $100,000 and one to handle purchases under $100,000.

RESPONSE: Plaintiff agrees with the defendant's alleged material fact in part. Plaintiff contends that the management study was not requested by C&L, but by the Librarian's Office, specifically Ms. Linda Washington, the Plaintiff's mentor who illegally hired the management firm without competition to perform the study.  It was advantageous for MCM to make the recommendations that they made, because part of the recommendation was the removal of the Chief, Ms. Debra Murphy.  Afterward Ms. Washington hired Ms. Martin to carry out the recommendations.  Ms. Washington had a personal disagreement with Ms. Murphy.  Pltf's Depo. Page 85:1-85:31

8.  C&L management decided to implement the MCM findings and, to do so hired Ms. Catherine Martin, who was a principle of MCM, as the Acting Chief of C&L and to implement the sudy's findings.

RESPONSE: Plaintiff agrees with the defendant's alleged material fact in part. Plaintiff contends that C&L management did not decide to implement the findings and hire Ms. Martin, but it was the Librarian's Office who did so, particularly Ms. Linda Washington, who is named in this suit.

9.  Consistent with the MCM study and recommendations, once Ms. Martin's first actions was to assign one of the two teams to handle purchases over $100,000 and assign the other team to handle purchases under $100,000. Additionally, consistent with the structure of the office prior to the implementation of the MCM findings, Team One was led by Mr. Jasper and Team Two was led by Ms. Klinker.  Team One handled contracts under $100,000 and Team Two handled contracts over $100,000.  The only exception to the division of work by dollar value between the two teams was that plaintiff was permitted to continue working on the one contract she was working on previously that was valued at over $100,000.  Pltf's Depo. Page 98

RESPONSE: Plaintiff agrees with the defendant's alleged material fact in part. Plaintiff contends that Ms. Linda Washington requested that she work on the one contract, not that she was permitted to continue to work on it.  Plaintiff also contends that she attempted to give the contract back, but was not allowed to do so because Ms. Washington was adamant about Plaintiff's continued work on the loan contract in a effort to undermine Plaintiff's argument that she was not allowed to work on large contracts.

10.  Ms. Helen Mathura and Ms. Ruth Nelson, the two senior grade level contract specialists in C&L were assigned to Team Two, the team led by Ms. Klinker.  ("We took into effect the experience level and the capabilities of the people, the experience level.")  The other contract specialists in the office, including plaintiff, all of whom were junior in grade level to those contract specialists on Team Two, were assigned to Team One, the team led by Mr. Jasper.

RESPONSE: Plaintiff agrees with the defendant's alleged material fact in part, but contends that she was not apprised of why Ms. Martin made the decision to divide the teams as she did.  Plaintiff assumed that the teams were being split as they had been from the beginning, one "White team" and one "Black Team, because this is how the division resulted.  Pltf's Depo. Page 105:18-105:25

11.  A little less that a year after being hired as Acting Chief of C&L and realigning C&L, Ms. Martin left her position with the Library of Congress.  Shortly after Ms. Martin left, ("Mr. Jasper was placed in charge of both teams which were subsequently combined into one team").

RESPONSE: Plaintiff agrees with the defendant's alleged material fact in part.  Plaintiff contends that Ms. Martin was relieved of her responsibilities, that one day the Plaintiff and her coworkers came into work and Ms. Martin was crying, because she had been asked to leave.  Ms. Martin had been illegally hired and had not gone through the proper personnel channels.  Pltf's Depo. Page 106:9-106:13

12.  In approximately November 2002, C&L was again realigned.  Under this realignment, all individuals had the opportunity to work on all contracts, regardless of dollar value.

RESPONSE: Plaintiff agrees with the defendant's alleged material fact in part.  Plaintiff contends that there was never a realignment, but a reorganization and the reason that she and others had the opportunity to work on all contracts regardless of dollar value, is because during this time both Helen Mathura and Kaye Klinker were retiring from the Library.  Ruth was seriously seeking another position and was subsequently hired by Ms. Catherine Martin, MCM who had been hired by the Capitol Police.  Plaintiff contends that the Library had no other alternative, but to have the remaining staff work on the large contracts.

13.  During the almost one year that C&L was realigned into two teams, plaintiff retained her GS-11 grade level, maintained her Contract Specialist position, continued to make the same salary, continued to receive cost of living raises, continued to accrue benefits at the same level, continued to work on contracts, and maintained the same supervisor; during the almost one year realignment. "(e)verything remained at the same level."  Moreover, plaintiff continued to perform the duties specified in her position description in the GS-1102-11 Contract Specialist Position Description.

RESPONSE: Plaintiff disagrees with the defendant's alleged material fact. Plaintiff contends that there was never a realignment and that she had been affected by the results of

an unauthorized reorganization, which continued to destroy her career. The union was never consulted prior to the reorganization to determine impact on employee's careers. Pltf's Depo. Page 128:20-128:24 Pltf's Depo. Page 130:8-130:17

14. Although plaintiff's complaint alleges that the realignment of C&L "caused her to remain at the GS-11 level for approximately five years despite receiving excellent and outstanding evaluations," see Compl. Par.21, plaintiff acknowledges that there were no instances or allegations of her being non-selected for promotion on the basis of race or age at issue in this action. Moreover, in deposition plaintiff could identify no specific promotion for which the realignment hampered her ability to obtain.

RESPONSE: Plaintiff agrees with the defendant's alleged material fact in part. Plaintiff contends that all of the evaluations that she received were either excellent or outstanding, but she had not received an evaluation in several years. The last official evaluation that she received was given to her by her supervisor Ms. Debra Murphy prior to the reorganization. Subsequent to that Mr. Jasper attempted to evaluate her with an outstanding rating. Ms. Linda Washington requested that he lower that rating. His refusal resulted in the Plaintiff not receiving an evaluation at all. The plaintiff did not receive an evaluation until October, 2006. The absence of an evaluation has hampered her career because all job applications must be accompanied by a current evaluation. Subsequently, the reorganization hampered Plaintiff's career, because she was unable to qualify for job openings that have currently been advertised in her office at the GS 13 and 14 levels. Feedback from the current supervisor is that Plaintiff does not have adequate experience to qualify. The plaintiff additionally contends that she has applied for numerous contracting officer positions at the Library of Congress but cannot qualify. Positions outside of the agency require evaluations and more experience that she does not possess due to the discriminatory practices at the Library of Congress. In response to the Defendant's mention of age in this action, Plaintiff contends that she has recently filed a complaint referencing age as a discriminatory factor. The issues of this case however are race and gender. Furthermore, there were no non-selections for promotions based on race, because there were no promotion opportunities during the reorganization. Moreover, the reorganization eliminated opportunities for promotion and hindered Plaintiff's promotion potential and precluded her from working on large contracts—thus preventing Plaintiff to obtain experience needed to be promoted once the reorganization was reversed. Pltf's Depo. Page 128:20-128:24 Pltf's Depo. Page 129-130

15. On July 3, 2002, plaintiff filed a timely formal complaint of discrimination. This formal complaint alleged that the realignment was discriminatory against plaintiff solely on the basis of her race.

RESPONSE: Plaintiff disagrees with the defendant's alleged material fact. Plaintiff contends that she was confident that she has amended the complaint to state Gender as well. Pltf's Depo. Page 134-136

16. Plaintiff's complaint requests that she be reimbursed for her master's degree tuition because she obtained permission from the Library to study the Procurement Office as part of the course work for a master's degree. Notwithstanding the request, plaintiff has

never requested that she receive reimbursement of her student loans under the Library student loan repayment program.  Moreover, plaintiff has never filed an EEO complaint relating to the Library's failure to pay her master's degree tuition, other than requests for relief filed in the course of litigating her discrimination claim.


     RESPONSE: Plaintiff disagrees with the defendant's alleged material fact in part. Plaintiff contends that she did request and received a nominal reimbursement for some of the coursework.  That reimbursement was authorized by Gary Columbia.   Subsequent to this reimbursement the Library instituted a program that reimbursed employees fully if the coursework assisted in the employee's position, which this study did.  The Plaintiff has never filed an EEO complaint relating to the Library's failure to pay her master's degree. The Plaintiff felt that with her promotional opportunities that she would have the ability to pay the student loans.  But since she has not been able to achieve the positions and salaries that she should have received if it had not been for the unauthorized reorganization and the discrimination, Plaintiff feels that the Library should incur the debt. Pltf's Depo. Page 142 Pltf's Depo. Page 150



I, Valda Murfree-Fleming being duly sworn on November 13, 2006, hereby certify that Plaintiff responses to the above statements are true and accurate to the best of my knowledge.

Signature                    Dated

Subscribed and sworn to before me on _November 13, 2006_

(Signature)

Notary Public in and for the County of _Prince Georges_ in _Maryland_

(Seal)

ROSA L. BEATTY
NOTARY PUBLIC STATE OF MARYLAND
My Commision Expires December 01, 2009

11

71

1 period, I'm talking November 2001 to November 2002, okay?

2    A   Okay.

3    Q   Let's -- for -- you know what, strike that.  I will

4 use the actual months just so there is no -- up to November,

5 roughly November 2002, it was called the Contracts and

6 Logistics Services Division, correct?

7    A   Yes.

8    Q   And that was under the Integrated Support Services

9 Section or Division of the Library of Congress, correct?

10   A   Yes.

11   Q   Okay, so if we get the chain of command here, it

12 goes the Library of Congress.  Under that was the Office of

13 the Librarian, then under that is the Integrated Support

14 Services Division.  Then you go down to the Contracts and

15 Logistics Services Division which is the area in which you

16 worked, correct?

17   A   Yes.

18   Q   Okay.  Now the Contracts and Logistics Services

19 Division, they were responsible -- or that division was

20 responsible for handling -- why don't you tell me what the

21 responsibilities of the Contracts and Logistics Services

22 Division as you understood them?

23    A   Procuring -- purchasing for the government.

24 Purchasing supplies, services, negotiating contracts,

25 basically handling all of the needs that the library had for

21

1  promotion, right?

2     A    Say that one more time.

3     Q    Just by successfully performing your duties as a GS-

4  9 procurement specialist, you understood that you could

5  receive a GS-11 promotion after a year, right?

6        MS. LILES:  Are you asking if someone told her that?

7        BY MR. HENAULT:

8     Q    Is that -- was that your understanding of the

9  position?

10     A    Do you want me to say specifically what my

11  understanding of the position --

12     Q    Please.  Please tell me.

13     A    My understanding of the position was that once

14  coming over to the contracts office and getting into this

15  program that I could go up to at least a 14.  That was my

16  understanding.

17     Q    Okay.  Where did you get that understanding, ma'am?

18     A    Because we had had another employee who was in the

19  program, and he at least had gone to the 12 and was on his way

20  up to the 12 -- up to the 13 so --

21     Q    Who is that employee?

22     A    Michael Baytop.

23     Q    How do you spell his last name, ma'am?

24     A    I think it's B-A-Y-T-O-P.

25     Q    And he was in what program?

D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

24

1     A    I don't know that.

2     Q    How long ago did he retire?

3     A    He's been retired for at least 3, 3 to 4 years now.

4     Q    Okay, and, and how long was he a GS-12 before he

5  retired?

6     A    Don't know that.

7     Q    How long was he a GS-11 before he was promoted to

8  GS-12?

9     A    I don't know.  I'm going to say I don't know the

10  history of his promotions.

11    Q    Okay, so -- but your position is that because Mr.

12  Baytop had received a GS-12 --

13    A    Um-hum.

14    Q    -- and had previously been in the affirmative action

15  associate program that you should also receive a GS-12?

16    A    No, I didn't say that.  I was saying that we -- the

17  affirmative action was the same for all, for all employees and

18  that we, we really should have been getting -- receiving the

19  same types of treatments under the same laws and rules and

20  regulations.  That's all -- the same.

21    Q    Okay, but you don't know whether Mr. Baytop had to

22  compete and apply for a 12 position?

23    A    I don't.

24    Q    Okay.  Was your understanding of your procurement

25  specialist GS-11 position, and I apologize if I have asked

73

1    A    Caucasian I think.

2    Q    Okay.

3    A    Yes.

4    Q    How long were you under the supervision of Mr.

5  Columbia?

6    A    Until Deborah Murphy came.

7    Q    So -- okay --

8    A    Until roughly -- do you recall that Ms. Murphy

9  joined in approximately August of 1998?

10    A    That sounds about right.

11    Q    Okay, so -- okay, so between joining the Contracts

12  and Logistics Section in 1995 and roughly -- again roughly

13  August of 1998, the Contracts and Logistics Section was

14  divided into, into two parts, correct?

15    A    Yes.

16    Q    You were on the, the team, for lack of a better

17  word, is that fair, two teams?

18    A    They weren't teams then.  They were just -- we just

19  referred to them as small purchases and one as contracts.

20    Q    Okay.

21    A    We didn't usually say team though.

22    Q    So between you joining in '95 I think I just said,

23  my apologies, between you joining the Contracts and Logistics,

24  Logistics Office in October of '95 and Ms. Murphy joining in

25  roughly August of 1998, you were under the supervision of Gary

D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947
74

1 Columbia, and you were on the small purchase section, right?

2    A    Yes.

3    Q    So you handled contracts under $50,000?

4    A    At that time, the limit was 50,000.

5    Q    Okay.  Did that change when Ms. Murphy took over in

6 roughly August of 1998?

7    A    It did.  It -- she attempted to, to make the

8 changes.

9    Q    Okay.  What changes did she attempt to make, ma'am?

10    A    First of all, we were all assigned partners.  We

11 were supposed to partner with the, the white females who were

12 contracting officers that performed contracts over $50,000 to

13 $100,000.

14    Q    So you were now -- correct me if I'm wrong, please,

15 because it's your testimony that matters.  After Ms. Murphy

16 joined, you started working with people to work on contracts

17 that went up to $100,000?

18    A    That was what she, she requested that they do, but

19 it never happened.

20    Q    It was resisted.

21    Q    Okay.  After Ms. Murphy joined in August of 1998 and

22 roughly mid-2001, okay, or let's say November of 2001 when the

23 realignment or reorganization occurred, did you work on

24 contracts that were valued up to $100,000?

25    A    Under -- when Ms. Murphy was --

FREE STATE REPORTING, INC.
Court Reporting   Depositions

79

1     A   I don't remember the year.  I, I should not give a

2  year if I don't really remember.

3     Q   Okay.

4     A   I mean I don't remember the exact year.

5     Q   But, but you do recall requesting the transfer to

6  Mr. Jasper's team and being transferred to Mr. Jasper's team?

7     A   Yes, I did.

8     Q   Because you weren't happy working under Ms. Klinker?

9     A   Well, can we change the word "happy" because I

10  was -- it wasn't that I wasn't happy.  It just -- I just felt

11  that the treatment was inequitable.

12     Q   Okay, you felt that you were not getting the dollar

13  value contracts that you wanted to work on?

14     A   Yes.

15     Q   Okay.  How long, to the best you can recall, we have

16  already talked about the fact that the realignment or

17  reorganization occurred in roughly November 2001.  How long

18  before that had you been on Mr. Jasper's team?

19     A   From the time that Cassie Martin left, I was on, I

20  was on her team from that -- I think from that time up from

21  the time that Cassie Martin -- maybe not exactly.  It's

22  whenever --

23     Q   Okay, I think, I think there's -- let me see if I

24  can clarify, because I think my question might be confusing.

25  Okay, the original reorganization, realignment implemented by

84

1    A    I recall that.

2    Q    Okay, and in fact, management -- well, one of the

3  principles from Martin Contract Management was a woman named

4  Catherine, also known as Cassie, Martin, correct?

5    A    Yes.

6    Q    Okay, and in fact, after Ms. Martin delivered the

7  results of her study to management, they decided to hire her

8  to come in and implement the study, correct?

9    A    Yes.

10    Q    So in late 2001 --

11    A    When --

12    Q    Okay, in late -- in roughly the fall of 2001,

13  management brought Ms. Martin in to implement the findings of

14  her study, right?

15    A    That's what I wanted to correct.

16    Q    Okay, please --

17    A    Because I'm not sure that they, they brought her in

18  to implement it.  I just know that she was hired as the new

19  chief.

20    Q    Okay.

21    A    Yeah.

22    Q    Fair enough.

23    A    I don't know what, what her purpose --

24    Q    Okay.

25    A    -- I mean I'm not clear on that.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

98

1   contracts was senior in grade level to everyone handling the

2   lower-dollar contracts?

3       A    That's correct.

4       A    Okay.  When you started handling -- when you --

5   after November 2001, okay, when Mr. Jasper's team was assigned

6   contracts under $100,000, you still administered one contract

7   that was over $100,000, didn't you?

8       A    It was, it was either exactly $100,000 or a little

9   over.

10      Q    Okay.  That contract was not taken away from you

11  after Mr. Jasper's team was tasked with the sub-$100,000

12  contracts, was it?

13      A    Correct.

14      Q    Did you continue to administer that contract until

15  the life of that contract expired?

16      A    I was requested personally by Linda Washington to

17  keep that contract.

18      Q    And you did keep it?

19      A    I had to.

20      Q    Okay.  Was anyone else, to your knowledge, on

21  Mr. Jasper's team handling contracts over $100,000 after

22  Ms. Martin instituted the, the realignment?

23      A    I think I was the only one who really wanted to do

24  contracts over $100,000, and I don't know what Chris was

25  doing, because he wasn't in the office.  He was in the law

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

105

1    Q    What did Ms. Washington say to inform -- was this

2   meeting just between you and her, or who was at the meeting?

3    A    It's everyone, all of the staff.

4    Q    Okay.

5    A    And including the staff, Gary Columbia, union rep.,

6   everyone was there.

7    Q    Okay, so what did Ms. Washington say?

8    A    She just informed us that -- about the study and

9   that she was, that she was moving Deborah Murphy out and that

10  we were going back to the old form.  We were going to be -- we

11  were going to go back to small purchases and contracts over

12  100,000.

13   Q    Okay, and you had been that way before?

14   A    Yes.

15   Q    Okay, so she was making it back to the way it was?

16   A    Yes.

17   Q    And what did you say to Ms. Washington?

18   A    I asked her about it.  I said did you mean we're

19  going back to the old way that we were and, and I said I

20  really don't -- I really would like to stay -- continue doing

21  large contracts.

22   Q    Okay, and what did Ms. Washington say to you?

23   A    She told me that I didn't understand the big

24  picture.

25   Q    Okay, and what did -- did you understand what she

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

106

1  meant by "the big picture?"

2     A   No, I didn't.  I, I knew that I understood "the big

3  picture" because it was dealing with my future.

4     Q   Okay, fair enough.  Now we've been talking a lot

5  about November 2001 when, when Ms. Martin came in and

6  instituted the, the realignment or reorganization?

7     A   Yes.

8     Q   Okay.  Do you know when Ms. Martin left?

9     A   Ms. Martin was probably there about less than a

10  year.

11    Q   Okay, so it would have been before November of 2002?

12    A   I think.  I'm not positive, but I know she was there

13  a short period of time.

14    Q   What happened after Ms. Martin left?

15    A   Linda Washington assumed the position for a while.

16    Q   Okay.  Did Ms. Washington maintain the division of

17  the two teams by dollar amount?

18    A   I don't believe she changed anything.  The, the

19  reorganization stayed in place.

20    Q   Okay.  There came a time when that reorganization

21  was undone though, correct?

22    A   I don't remember them, you know, doing the --

23  reorganizing again after that.  I just don't remember that.

24    Q   Well, I think -- we talked about paragraph 22 of

25  your complaint, ma'am.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

128

1  Counsel, do you know if this had been amended?

2      MS. LILES:  No, I don't.  So she'll have to check on

3  that.  To my knowledge, no.

4      MR. HENAULT:  Okay.  To your knowledge, it was not

5  amended, or to your knowledge, you don't know?

6      MS. LILES:  I don't know.

7      MR. HENAULT:  Okay.

8      BY MR. HENAULT:

9    Q   So with the caveat that it could be an amendment --

10  there could be an amendment, the July 3, 2002 EEO complaint

11  that is basically the subject of this lawsuit now only alleged

12  discrimination on the basis of being African-American,

13  correct?

14    A   That's on this paper, yeah.

15    Q   Okay.  Ma'am, what about the realignment in November

16  of 2002, or reorganization, refer to it as you want,

17  discriminated against you on the basis of your race?

18    A   What about it?

19    Q   Yes, ma'am.

20    A   Because it hampered me in a way that I was unable to

21  continue my progress as far as completing or continuing to do

22  large contracts which is the basis for which people are

23  promoted on, on the level of complexity of their work at the

24  Library of Congress in the contracts office.

25    Q    Okay.

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

130

1    A    I have.

2    Q    -- positions that you didn't receive?

3    A    I have.

4    Q    Okay.  That's not part of this case though, is it?

5    A    No.

6    Q    Okay.  You are just making the allegation that the

7    reorganization hampered you in getting later promotions?

8    A    Oh, just -- it hampered my career progress, not

9    later but on -- I mean when you are a contracting officer

10   you -- it's a continuity of things.  You don't just do small

11   purchases, then you do large and then you do small.  You --

12   it's a continuity.  You are recognized in the field as a

13   contracting officer who does complex contracts, not as a

14   contracting officer that does complex, and then she goes back

15   to small purchases.  That -- this ruins my career as a

16   contracting officer.

17   Q    Ma'am, in November of 2002, you again started doing

18   large contracts, right?

19   A    Not to the magnitude that I was doing or that I

20   needed to have them -- to do them.

21   Q    Okay.

22   A    And then on top of -- excuse me.  I know you -- I

23   didn't finish.  On top of that, I think I was working on the

24   one that Linda Washington requested that I keep, but not where

25  I should have been or where I, where I wanted to be.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

134

1   females is my basis for why I named that as gender.

2      Q   Okay.

3      A   I placed that as gender.

4      Q   I understand that's why you named it, but I want to

5   know specifically what about that reassignment, realignment,

6   reorganization, whatever you want to call it, was

7   discriminatory on the basis -- against you on the basis of you

8   being a female.

9      A   Oh, because she is a female, and she discriminated

10  against another female.

11     Q   By placing all females on one team and all females

12  on another team?

13     A   Now remember the description that I gave to all the

14  females.  That's very important.

15     Q   And what's that description, ma'am?

16     A   Educated, intelligent, articulate.

17     Q   So is the discrimination by Ms. Linda Washington, is

18  that against you because you are a female, or because you are

19  educated, articulate and intelligent?

20     A   I think it's both.

21     Q   Okay.

22     A   Only ones -- she only discriminated against the ones

23  who were -- who had those characteristics.  Those are the ones

24  she discriminated against.

25    Q    Okay.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947
142

1    degree, how much in student loans do you have relating to your

2    master's degree?

3        A    About $27,000 to $28,000.

4        Q    Okay, and that was just solely from your master's

5    degree program?

6        A    It was part of the -- my -- well my master's was

7    like $27,000 to $30,000.

8        Q    Okay.  What I need to know is how much you had in

9    student loans relating to just your master's degree.

10        MS. LILES:  If you know.

11        WITNESS:  Oh, you mean do I tell you now?

12        BY MR. HENAULT:

13        Q    Yes, ma'am.

14        A    Oh, I don't know that.

15        Q    Okay.  What -- you are seeking tuition reimbursement

16    for your tuition for the master's degree. How much was that

17    tuition?

18        A    It was around $27,000 to $30,000.

19        Q    Well, ma'am, what we have here is a complaint that

20    is requesting the court order the Library of Congress to pay

21    some specific amount for your tuition for master's degree.

22    How much are you seeking?

23        A    Whatever is there, that's, that's the amount of the

24    master's degree.  It's no more or, or no less.

25    Q   So if this doesn't provide an amount for your

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

152

1    Q   Okay.

2    A   Pretty sure there is.

3         MR. HENAULT:  Let's take about a 5-minute break if

4   we could and I think -- famous last words, but I think we're

5   just about done.

6         MR. JAMES:  Great.

7         COURT REPORTER:  Going off at 1:25.

8         (Off the record at 1:25 p.m.  Back on the record at

9   1:35 p.m.)

10        COURT REPORTER:  On the record at 1:35.

11        MR. HENAULT:  Okay.  Ma'am, up until this last

12   break, you have had a green file that was sitting here, and I

13   notice that you have now put that down beside you.  Can you

14   hand me that file please?

15        WITNESS:  Sure.  It's all my, my complaints and

16   things.

17        MS. LILES:  Don't take my complaints.

18        WITNESS:  That's mine.  That's mine.

19        MS. LILES:  That's -- don't take my -- it goes in

20   the file.

21        MR. HENAULT:  Oh, okay, that's -- okay.

22        MS. LILES:  I was just trying to give you a complete

23   file.

24        MR. HENAULT:  Actually, we can just go off the

25  record while I just flip through this.  I'm sorry.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
 Balt. & Annap. (410) 974-0947